**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
Harrisonburg Division

ASHLEY ADAMS,

　　　　　*Plaintiff,*

v.

ROCKINGHAM COUNTY,

　　　　　*Defendant.*

Case No.:　　　5:21-cv-00006-TTC

**FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff Ashley Adams, by and through undersigned counsel, and for her First Amended Complaint against Defendant, Rockingham County, ("Defendant" or "Rockingham") alleges as follows:

**INTRODUCTION**

1. Plaintiff Ashley Adams brings this action against Defendant pursuant to Title VII of the Civil Rights Act of 1964, 42, U.S.C. § 2000e et seq., as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 1981A ("Title VII"). Accordingly, it was unlawful for Defendant to discriminate against and harass Ms. Adams because she was female and because she was pregnant or to retaliate against her for engaging in protected activity.

2. Ms. Adams brings this action against Defendant for damages arising out of gender discrimination pursuant to Title VII of the Civil Rights Act of 1964.

**PARTIES**

3. At all times relevant to the Complaint, Plaintiff has been and is a resident of Virginia.

4. From December 2014 to November 2, 2017, Plaintiff Ashley Adams was an employee of Defendant Rockingham County.

5.  Defendant Rockingham County conducts business operations from its Harrisonburg-based Administrative Office Building located at 20 East Gay Street, Harrisonburg, Virginia 22802.

## JURISDICTION

A.  Subject Matter Jurisdiction

6.  Plaintiff originally filed her suit in the Circuit Court for Rockingham County, Virginia, Case No. CL20-4622, where that court had jurisdiction over Plaintiff's claims pursuant to Va. Code Ann. § 17 .1-513.  On January 21, 2021, Defendant filed its Notice of Removal to the United States District Court for the Western District of Virginia, Harrisonburg Division, pursuant to 28 U.S.C. §1441(a).

B.  Personal Jurisdiction

7.  This Court may properly maintain personal jurisdiction over Defendant because Defendant conducts business within this state and judicial district.

## VENUE

8.  Venue is proper in this Court pursuant to 28 U.S.C. §1441(a) *et seq.* because the Defendant's principal place of business is located within this judicial district.

## ADMINISTRATIVE PROCESS

9.  Prior to instituting this action, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on March 12, 2018. See Exhibit A.

10. On or about July 23, 2019, the EEOC issued a cause finding specifying that there is reasonable cause to believe that Title VII of the Civil Rights Act of 1964, as amended, has been violated. See Exhibit B.

11. On September 29, 2020, the EEOC issued a Notice of Right to Sue and Conciliation Failure. See Exhibit C.

12. Ms. Adams' suit is timely filed with this Court.

## FACTUAL BACKGROUND

13. Ashley Adams began her employment with Rockingham County as Economic Development and Tourism Coordinator in December 2014. She began work as an intern when she was a senior at James Madison University.  After four weeks Defendant hired her full time.

14. Ms. Adams' direct supervisor was Ashton Rawley, whose peer supervisor, Bart Bridges, worked in the same office with Ms. Rawley and Ms. Adams. Her second-line supervisor was Kathy McQuain, Ms. McQuain held the position of Director of Parks and Recreation and was a close family friend of Mr. Bridges.  Rockingham County's Human Resources representative to the office, Jennifer Mongold, was also a friend of Mr. Bridges.

15. From Ms. Adams' first weeks on the job, she received warnings from female coworkers that she should watch out because Bart Bridges was "handsy." Various staff, including those interviewed by Defendant's investigator[1], Kate Fitzgerald, told Ms. Adams about what she later observed herself and eventually experienced: Mr. Bridges regularly rubbed the necks and shoulders of interns and subordinate staff without invitation. Mr. Bridges soon began giving "massages" to Ms. Adams, at which time he whispered messages into her ear such as "you smell good." Mr. Bridges also engaged in inappropriate "locker room" talk throughout the office concerning his opinions about the bodies or appearance of female

---

[1] After Ms. Adams contacted Rockingham's Board of Supervisors raising her allegations of sexual harassment and hostile work environment on November 2, 2017, Rockingham initiated an investigation into Ms. Adams' claims and subsequently retained Ms. Fitzgerald to conduct an independent investigation.

employees, sexual photos from the internet, and his own sex life. Ms. Adams was uncomfortable hearing this talk, especially because Mr. Bridges expected Ms. Adams and the other staff to engage him and laugh about topics that were inappropriate and unacceptable. However, because Ms. McQuain was usually present and engaged Mr. Bridges when he made these comments, Ms. Adams knew that reporting his comments to Ms. McQuain would not have any effect.

16. In the fall of 2016, intern Michael Dawson reported to Ms. Adams through a series of text messages that the previous summer, Mr. Bridges had made him uncomfortable by touching his neck and shoulders without invitation, and regularly made inappropriate comments about other workers in the office.  Mr. Dawson also reported to Ms. Adams that when Mr. Bridges saw a photo of Mr. Dawson's younger sister, he (Mr. Bridges) started texting Mr. Dawson questions and comments about his sister, including asking him "when she will be of age." Concerned, and knowing based on Mr. Bridges reputation and her own experience that Mr. Dawson's report was true, Ms. Adams reported Mr. Dawson's text messages to Ms. McQuain.

17. As a result of Ms. Adams' report to Ms. McQuain, Ms. McQuain alerted County Administrator Stephen King, who called a meeting with Ms. Adams, Ms. McQuain, and Ms. Mongold. At the meeting, Mr. King instructed Ms. Adams not to talk about Mr. Dawson's claims or text messages. He then instructed Ms. Adams to leave the meeting while the remaining individuals continued to meet.

18. After the meeting with Mr. King, Mr. Bridges stopped making inappropriate jokes and comments for about a week before resuming his usual course of conduct of making inappropriate comments and engaging in unwanted touching.

19. In November 2016, Ms. Adams became pregnant. After Ms. Adams announced her pregnancy in the office, Mr. Bridges resumed making inappropriate sexual and/or pregnancy-related comments. For example, he "joked" that the baby "might be [his]," suggesting that he and Ms. Adams had engaged in a sexual relationship.

20.  Mr. Bridges also suggested on multiple occasions that the baby had been fathered by one or another of Ms. Adams' coworkers, including but not limited to, Howard Taylor and Dontae Gholson, "joking" that "the baby might come out half black."  Mr. Bridges' inappropriate comments were distressing for Ms. Adams and her fiancé as well as her coworkers, who sympathized with her in private.  However, because Ms. McQuain (Mr. Bridges' supervisor) was frequently present when Mr. Bridges made his comments and because she laughed at and seemed to enjoy his "jokes," thus encouraging Mr. Bridges' illegal actions, Ms. Adams reasonably believed that reporting his conduct would not change anything besides putting her at risk of retaliation.

21. Both Mr. Bridges and Ms. McQuain made "jokes" about Ms. Adams not returning to work after her maternity leave, suggesting they both expected this outcome. Ms. Adams was shocked at management's reaction to her impending parenthood, particularly because when her male coworker, Jerry West, took paternity leave in June 2015, no one, including Mr. Bridges, made any similar comments about him.

22. In April 2017, when Ms. Adams' direct supervisor, Ms. Rawley, returned from maternity leave for a few weeks before resigning to stay home with her newborn twins, these comments directed at Ms. Adams by Mr. Bridges and Ms. McQuain intensified. In May 2017, Mr. Bridges made another comment about Ms. Adams becoming a stay-at-home mom during an interaction involving several other male coworkers.  Even though she immediately

told Mr. Bridges his comment was inappropriate, Mr. Bridges and the other men just laughed at her and told her she was being "hormonal" because she was pregnant.

23. Later in May 2017, Ms. McQuain promoted Mr. Bridges to the position of Parks and Recreation Manager.  Ms. Adams became concerned about his growing influence in the department in light of his ongoing harassing comments and Rockingham's clear indifference to his actions. Accordingly, Ms. Adams set up a meeting with Human Resources Director Jennifer Mongold and reported her concerns that Mr. Bridges and Ms. McQuain frequently made inappropriate comments about her pregnancy and/or about her not returning from maternity leave despite her having informed them she intended to return to work.  These comments include, but are not limited to an instance when, during their monthly staff meeting, Ms. Adams was preparing to give her report when Mr. Bridges yelled out, "No, next, skip Ashley. We all know she is not coming back."  Ms. Adams was upset and explained that she wanted the opportunity to give her report, as everyone else had been allowed to do.  Mr. Bridges replied, "there are the pregnancy hormones."

24. Ms. Adams also reported her concern that Ms. McQuain had told Jerry West, her coworker, that management was planning to fill Ms. Rawley's position with an internal candidate without sharing this information with anyone else in the department. Ms. Adams informed Ms. Mongold that Mr. West had fewer duties and less responsibility than she did[2], yet Ms. McQuain was treating him more favorably because Ms. Adams was pregnant and would be taking maternity leave. Ms. Mongold simply stated she would take Ms. Adams' report under advisement.

---

[2] Mr. West, who is Ms. McQuain's cousin, submitted less than twelve programs each season and oversaw one, while Ms. Adams submitted, created and/or oversaw over 100 programs each season.

25. The day after Ms. Adams reported Ms. McQuain's preferential treatment of Mr. West to Human Resources, Ms. McQuain she texted Ms. Adams in all-caps and instructed her, "I NEED TO SEE YOU IN MY OFFICE AFTER MY MEETING." In a face-to-face meeting later that day, Ms. McQuain berated Ms. Adams for "running to HR" about her "issues."

26. The following day, Ms. Adams informed Rockingham County Administrator, Stephen King, about Ms. Mongold's favoritism and Ms. McQuain's retaliatory conduct. Mr. King spoke informally with Ms. Mongold but not with Ms. McQuain. Mr. King did not impose discipline on either Ms. Mongold or Ms. McQuain for retaliating against Ms. Adams after she reported nepotism.  Ms. Mongold and Ms. McQuain's retaliatory response to Ms. Adams' report, which included Ms. McQuain's comment that Ms. Adams "can run and cry to the County Administrator again if you want," had a chilling effect on Ms. Adams and made her fearful to report Mr. Bridges' ongoing harassment, particularly because he was a close family friend of both Ms. Mongold and Ms. McQuain and who regularly socialized with them.

27. In late April or early May, shortly before Ms. Rawley's last day with Rockingham County, Ms. Rawley's position of Recreation Programs Supervisor officially opened to applicants. Ms. Adams submitted an application, along with two other internal candidates and three external ones. The day after Ms. Adams applied, Ms. Rawley told Ms. Adams in person that she had spoken with Ms. McQuain and that Ms. McQuain did not want to hire Ms. Adams to the position. Ms. Rawley said Ms. McQuain specifically stated, "Ashley won't be any good to me since she's going on maternity leave." Ms. Rawley was offended by Ms. McQuain's stance since at that time Ms. Rawley had recently returned from maternity leave herself.

28. Ms. Mongold interviewed Ms. Adams for the position only after she had interviewed all the other candidates, all male.  Ms. Adams' interview was the only one Ms. McQuain did not attend, although Ms. McQuain was, in fact, in the office that day. When Ms. Adams raised this issue, Ms. Mongold stated Ms. McQuain could not attend because she had meetings that day.  Ms. Adams requested a second interview with Ms. McQuain present so that all the interviews would be conducted under the same circumstances.  Although Ms. Mongold refused this request, Ms. McQuain invited Ms. Adams to a one-on-one interview using Ms. Mongold's interview notes.  During this interview, Ms. McQuain asked Ms. Adams several questions specific to her pregnancy such as, "Do you know how hard it is to return to work after having a baby?" and "Do you think you can come back to work after having a baby?" Later that week, Ms. McQuain stated to Ms. Adams that she "thought long and hard and came to a decision over the weekend," essentially admitting that her one-on-one interview with Ms. Adams was purely pro forma and nothing more than an attempt to give the illusion of having treated Ms. Adams' candidacy with the same gravity as the two male, non-pregnant internal candidates she interviewed.

29. By the summer, Ms. Adams' pregnancy was visible, and in addition to the inappropriate comments, Mr. Bridges repeatedly touched Ms. Adams despite her requests that he not touch her.  In front of witnesses, he rubbed Ms. Adams' belly and placed his hands on her hips. Although Ms. Adams loudly stated, "stop touching me please," Mr. Bridges simply switched to rubbing her shoulders and telling her she "need[s] to relax."

30. Mr. Bridges also made egregiously sexist, objectifying comments about Ms. Adams. For example, he "joked" that Ms. Adams should be a stripper "on amateur night at Paradise City on Thursdays" – a strip club in West Virginia – so that she could afford to be a stay-

at-home mother after she gave birth.   He also repeatedly told her, "I know you have the moves (to be a stripper)" while winking at Ms. Adams.

31.  Mr. Bridges repeatedly asked Ms. Adams if she and her fiancé, DJ, still had sex "even though you're pregnant" and whether DJ "pokes the baby in the eye." After making these disgusting comments, Mr. Bridges openly discussed his sexual relations with his wife when she was pregnant.

32. Ms. Adams showed one of her coworkers an ultrasound and Mr. Bridges looked at it and began referencing her unborn baby as "my gummy bear" and would send Ms. Adams text messages asking how "[his] gummy bear is doing?"  One ultrasound picture showed Ms. Adams' unborn child with her legs over her head and Mr. Bridges stated, "that's how the baby was made too."

33. Mr. Bridges also commented to Ms. Adams, with coworker Dontae Gohlson present, that he was "happy his wife tore" during the birth of one of their children because this "made the doctor stitch her up tighter," and said that Ms. Adams' fiancé "should hope you tear too." Afterward, Mr. Gohlson approached Ms. Adams to tell her how shocked he was by Mr. Bridges' highly inappropriate comments.

34. Throughout the last few months of Ms. Adams' pregnancy, Mr. Bridges often approached Ms. Adams, squatting down into a baseball catchers position, placing his hands at the back of Ms. Adams' thighs and say, "if you are lubed up and cough, I am ready to catch the baby", "push", or "lube up."

35. Due to the ongoing stress, anxiety and humiliation she endured, Ms. Adams was forced to begin her maternity leave earlier than she planned, thus reducing the FMLA time she would have to spend caring for her newborn after the baby's birth. Ms. Adams underwent

numerous stress tests while pregnant, as stress has been medically proven to delay labor, and was two weeks past her due date when she had a Caesarian delivery of her newborn child.

36. On September 14, 2017, Ms. Adams returned to her Coordinator job. She requested and received permission from Ms. McQuain to take breaks once or twice per day to express breast milk – a practice Ms. McQuain later stated during investigation that Ms. Adams was "adamant" about., Ms. McQuain reluctantly approved Ms. Adams' breaks despite the fact that the Pregnancy Discrimination Act and the Patient Protection and Affordable Care Act specifically require employers as large as Rockingham County to provide nursing mothers private space and reasonable break time for expressing breast milk.

37. On multiple occasions between September and November 2017, when Ms. Adams closed her office door to express milk (with a sign on the door notifying coworkers of same), Mr. Bridges jiggled the door handle and call out inappropriate comments such as, "hey, you got my milk in there? I have cookies." The sign provided by Defendant was a laminated picture of a cow.  When Ms. Adams went to the staff kitchen space to refrigerate her milk, Mr. Bridges made inappropriate comments about her breast size before and after pumping, including pointing at her breasts and saying, "that's all those things made?" and also comments about drinking her breast milk. Mr. Bridge's extreme harassment led Ms. Adams to avoid pumping at work, suffering discomfort until she could get home. Mr. Bridges' misconduct had a direct and negative impact on her milk supply and her ability to breastfeed her baby.

38. In October 2017, Ms. Adams and several other coworkers were working at their desks when Mr. Bridges came into the workspace and announced he would help one of Ms.

Adams' female coworkers (Regina Phillips), who was single, "find a boyfriend." He immediately took over Ms. Phillip's workstation and logged onto the personals section of Craigslist.com, where he began clicking through ads with pornographic images while calling attention to the screen. Although Ms. Adams was extremely uncomfortable in the situation and observed that her coworkers felt the same based on their facial expressions, she also saw that Ms. McQuain was present in the room and was encouraging Mr. Bridges, laughing along with him when he made his inappropriate "jokes."

39. Based on her experience, she knew and was fearful that reporting Mr. Bridges' behavior to Ms. McQuain not only put her at risk of retaliation but also that reporting his conduct would change nothing, as Ms. McQuain not only witnessed and countenanced his misconduct, but actively encouraged it.

40. On November 2, 2017, Ms. Adams sent an email to Rockingham County supervisors, and County Administrator Stephen King, describing Mr. Bridges' harassment as the basis for her constructive discharge from Rockingham County.

41. In early November 2017, after Ms. Adams submitted an email detailing the harassment she had been experiencing and an explanation of how it had forced her out of her job, Rockingham County initiated an internal investigation. On several occasions, Rockingham County pressured Ms. Adams to participate in the investigation, going so far as to have Jennifer Mongold call Ms. Adams directly and request that she physically go to Rockingham County offices to be interviewed even after Ms. Adams' counsel had communicated to Rockingham County that Ms. Adams was represented by counsel.

42. In light of Ms. Adams' adversarial stance toward Rockingham County and separation from employment with Rockingham County, she did not participate in the investigation.

43. Despite Ms. Adams' non-participation, the investigator, Kate Fitzgerald, concluded based on the evidence supplied by Ms. Adams' coworkers that Bart Bridges and Kathy McQuain had engaged in egregious misconduct.

## CAUSES OF ACTION

## COUNT I

## PREGNANCY DISCRIMINATION IN VIOLATION OF
## TITLE VII AND THE PREGNANCY DISCRIMINATION ACT

44. Plaintiff re-alleges and incorporates all allegations of this Complaint as if fully set forth herein.

45. In Violation of Title VII, as amended by the Pregnancy Discrimination Act, Defendant discriminated against and harassed Ms. Adams after learning she was pregnant.

46. Rockingham County treated Jerry West, a male, better than Ms. Adams, when he went on paternity leave in June 2015 without receiving any inappropriate comments.

47. Defendant Rockingham County acted with malice and reckless indifference to Ms. Adams' rights under Title VII and the Pregnancy Discrimination Act when it discriminated against her, harassed her, and denied her a fair opportunity for career advancement.

48. As a direct and proximate result of Defendant's conduct, Ms. Adams has suffered damages in the form of lost earnings, benefits, and/or out-of-pocket expenses. As a further direct and proximate result of Defendants' conduct, Ms. Adams will suffer additional damages in the form of lost future earnings, benefits, and/or other prospective damages.

49. As a further direct and proximate result of Defendant's conduct, Ms. Adams has suffered mental and emotional pain, distress, and discomfort.

50. In engaging in the conduct alleged herein, Defendant acted maliciously and/or outra-geously toward Plaintiff, with conscious disregard for her known rights and with the

intention of cause, and/or willfully disregarding the probability of cause, unjust and cruel hardship to Plaintiff. In so acting, Defendant deliberately and intentionally injured Ms. Adams.

51. Finally, Plaintiff is entitled to costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT II

## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

52. Plaintiff re-alleges and incorporates all allegations of this Complaint as if fully set forth herein.

53. In violation of Title VII, Defendant discriminated against Plaintiff on the basis of her sex, by failing to prevent Mr. Bridges from touching Ms. Adams and making inappropriate comments to and about Ms. Adams.

54. Rockingham County treated Jerry West and Howard Taylor, both male and not pregnant, better than Ms. Adams, allowing them a fair opportunity to interview and be considered for a career advancement.

55. Rockingham did not subject its male employees who took paternity leave to any abuse or hostile work environment.

56. In taking the above-described discriminatory actions, Defendant acted with malice and reckless indifference to Ms. Adam's rights under Title VII.

57. As a direct and proximate result of Defendant's conduct, Ms. Adams has suffered damages in the form of lost earnings, benefits, and/or out-of-pocket expenses. As a further direct and proximate result of Defendants' conduct, Ms. Adams will suffer additional damages in the form of lost future earnings, benefits, and/or other prospective damages.

58. As a further direct and proximate result of Defendant's conduct, Ms. Adams has suffered mental and emotional pain, distress, and discomfort.

59. In engaging in the conduct alleged herein, Defendants acted maliciously and/or outrageously toward Plaintiff, with conscious disregard for her known rights and with the intention of cause, and/or willfully disregarding the probability of cause, unjust and cruel hardship to Plaintiff. In so acting, Defendants deliberately and intentionally injured Ms. Adams..

60. Finally, Plaintiff is entitled to costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT III
## RETALIATION IN VIOLATION OF TITLE VII

61. Plaintiff re-alleges and incorporates all allegations of this Complaint as if fully set forth herein.

62. Ms. Adams repeatedly reported the abusive and illegal conduct to her supervisors.  Her supervisors also repeatedly witnessed the abusive and illegal conduct.

63. In violation of Title VII, Defendant retaliated against Ms. Adams for engaging in protected activity by denying her the opportunity for career advancement and by continuing to subject her to more abuse and harassment and by failing to correct the illegal actions of its employees and subjecting Ms. Adams to an intolerable work environment.

64. There is a clear nexus between Ms. Adams' reports of illegal harassment and Rockingham's actions and inactions.

65. As a direct and proximate result of Defendant's conduct, Ms. Adams has suffered damages in the form of lost earnings, benefits, and/or out-of-pocket expenses. As a further direct

and proximate result of Defendant's conduct, Ms. Adams will suffer additional damages in the form of lost future earnings, benefits, and/or other prospective damages.

66. As a further direct and proximate result of Defendant's conduct, Ms. Adams has suffered mental and emotional pain, distress, and discomfort.

67. In engaging in the conduct alleged herein, Defendants acted maliciously and/or outrageously toward Plaintiff, with conscious disregard for her known rights and with the intention of cause, and/or willfully disregarding the probability of cause, unjust and cruel hardship to Plaintiff. In so acting, Defendants deliberately and intentionally injured Ms. Adams..

68. Finally, Plaintiff is entitled to costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k).

## COUNT IV

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

69. Plaintiff re-alleges and incorporates all allegations of this Complaint as if fully set forth herein.

70. In violation of Title VII, Defendant knowingly created and maintained a hostile work environment directed at Ms. Adams on the basis of her gender and her pregnancy and in retaliation for reporting harassment and objecting to it.

71. As alleged, above, the conduct of Mr. Bridges, Ms. McQuain and other Rockingham employees was unwelcome to Ms. Adams and despite her requests that the conduct cease, these individuals continued to subject her to abuse and harassment.

72. As alleged, above, the hostile work environment created and maintained by Rockingham was severe and pervasive and effectively altered the conditions of Ms. Adams' employment.

73. As the direct and proximate result of Rockingham's illegal actions, Ms. Adams has suffered severe emotional distress, pain and suffering.

**COUNT V – CONSTRUCTIVE DISCHARGE**

74. Plaintiff re-alleges alleges and incorporates all allegations of this Complaint as if fully set forth herein.

75. As described, above, Rockingham engaged in a pattern and practice of subjecting Ms. Adams a severe hostile work environment, the result of which was to fundamentally alter the terms and conditions of her employment.

76. As the direct and proximate result of Defendant's actions, Defendant subjected Ms. Adams to an intolerable working environment to such a degree that it effectively terminated her employment on or about November 2, 2017 when she "resigned" her position with Rockingham.

77. Rockingham was aware of the intolerable conditions to which it subjected Ms. Adams but was grossly indifferent to its actions or the effects its actions had on Ms. Adams.

78. As the direct result of this constructive termination, Ms. Adams has suffered lost wages.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Ashley Adams, respectfully requests that this Honorable Court enter judgment in her favor on all Counts of her Complaint and against Defendant, Rockingham County, and that she be awarded the following relief:

a.  Back pay in an amount to be determined;

b.  Front pay in an amount to be determined;

c.  Compensatory damages for her emotional distress, pain and suffering, in an amount to be determined, but no less than $200,000.

d.  Medical and other costs incurred as a result of Defendant's action;

e.  Reasonable attorneys' fees and court cost associated with this suit;

f.  Award of prejudgment interest, costs, and disbursement, as appropriate herein; and

g.  Such other, further relief as this Court and jury deems just or appropriate.

Dated: March 15, 2021

Respectfully Submitted,

/s/ *Joanne Dekker*
Joanne Dekker
Virginia State Bar No. 29941
The Spiggle Law Firm, PLLC
4830A 31st St., S., Suite A
Arlington, Virginia 22206
(202) 449-8527 (main number)
(703) 215-1123, ext. 1 (direct dial)
(202) 517-9179 (fax)
jdekker@spigglelaw.com
*Counsel for Plaintiff, Ashley Adams*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 16, 2021, I have electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Rosalie Pemberton Fessier, Esq.
Mandi Montgomery Smith, Esq.
Brittany E. Shipley, Esq.
TimberlakeSmith
25 North Central Avenue
P.O. Box 108
Staunton, VA 24402-0108
Telephone:      (540) 885-1517
Facsimile:      (540) 885-4537
E-Mail:         rfessier@timberlakesmith.com
                msmith@timberlakesmith.com
                bshipley@timberlakesmith.com

*Attorneys for Defendant, Rockingham County*

       /s/*Joanne Dekker*
Joanne Dekker, Esq.